## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) ) ) | **Crim. No. 08-43(HHK)** |
| **v.** | ) ) | |
| **CARLOS M. URQUIDI** | ) ) ) | |

### DEFENDANT'S MEMORANDUM  IN AID OF SENTENCING

Mr. Urquidi is before the Court pending sentencing after he entered a guilty plea on February 28, 2008.  Mr. Urquidi pled guilty to a criminal information that charged him with Theft From Programs Receiving Federal Funds in violation of 18 U.S.C. § 666(a)(1)(A). Pursuant to the conviction Mr. Urquidi faces a maximum sentence of ten years of incarceration, followed by a term of supervised release of not more than three years, a maximum fine of $250,000.00 dollars and a $100.00 dollar special assessment.

In the Pre-Sentence Investigation Report ("PSR"), Probation Officer Patricia Boyd, calculated a sentencing range of 18-24 months of incarceration pursuant to the advisory United States Sentencing Guidelines.  The range is based on a Base Offense level 15 and a Criminal History Category I. Mr. Urquidi will appear before the Court for his Sentencing Hearing on July 11,  2008.

### ARGUMENT IN SUPPORT FOR A SENTENCE OF PROBATION

**Background**

Mr. Urquidi is before the Court facing his first criminal conviction.  Besides the instant

offense, Mr. Urquidi's only other contact with law enforcement was an arrest that took place in 1985 in Bolivia. The case was closed and their was never any finding of guilt or criminal culpability against Mr. Urquidi. Seen in that historical context the instant offense is an anomaly in an otherwise exemplary life of impeccable conduct, verified work history and responsibility to his family. His appearance in a sentencing hearing will be an errant departure from the principles and values that he has followed throughout his life and which he has imparted on his four daughters.

Mr. Urquidi accepts full responsibility for his actions. He does not dispute the facts as set forth in the proffer that he signed at the time of the entry of his plea of guilty. There is no simple or defensible explanation for Mr. Urquidi's conduct. However, notwithstanding the substantial money that he embezzled, Mr. Urquidi appears before the court almost destitute. There is nothing in his current lifestyle that is indicative of material extravagance, greed or the accumulation of material objects beyond his means.

Far from being financially stable or enjoying the fruits of retirement, Mr. Urquidi subsists by working side by side with his wife, Beatriz. Together they work diligently and honorably as innkeepers running the Cave Hill Farm Bed and Breakfast. Once he resigned from the Pan American Development Foundation (hereinafter "PADF"), Mr. Urquidi was unable to secure employment in his field. Given in his age and the reason for his abrupt resignation from PADF, his professional career came to an end.

As in-keepers, Mr. and Mrs. Urquidi's modest earnings are based only on commissions. The commissions come at the tail end of expenses which include, the monthly rental, food and cleaning costs and everything related to running the bed and breakfast. Mr. Urquidi has been

working as an innkeeper since before his arrest in December 2007.  Running a bed and breakfast was the only viable employment option because of Mrs. Urquidi's culinary skills.  On account of her travels she learned to prepare cuisines from different parts of Latin America.  Mr. Urquidi's role in the business venture is to be in charge of cleaning the premises, making the beds, serving the meals, clearing the tables, washing dishes and to take care of everything relating to maintenance.  Clearly, this is a far cry from what Mr. Urquidi did throughout his entire professional life that spanned forty years.

Mr. Urquidi's illegal conduct is diametrically opposed to how he raised and provided for his four daughters.  His daughters are accomplished professionals either in the medical or business fields.  They have received bilingual educations, have graduate degrees, and have excelled academically in the United States and Latin America.  Mr. Urquidi has been responsible for paying the substantial costs of his daughters' tuition.  Mr. Urquidi has been a model father and made every conceivable effort to ensure that his daughters received the educational opportunities that would allow them to aspire, and succeed whether it was in the United States, Bolivia, Mexico or Spain.  Likewise he has been a faithful and loving companion to his wife of forty years.  Seen in that light, the illegal conduct that transpired in Colombia is all the more inexplicable and quite, frankly - very sad.

Although he has brought a great deal of shame to himself, Mr. Urquidi knows that he has to persevere through this adversity.  His journey for redemption began when he sought forgiveness, from his former employer, PADF, and from his family.  Although, PADF may never fully forgive him, his family has never wavered in supporting him through the most difficult moment in his life.  While acknowledging his shameful and illegal conduct, his aberrant behavior

has not diminished his paternal role and standing in the family. Family members recognize that Mr. Urquidi has done something terribly wrong and completely out of character. However, they do not forget that Mr. Urquidi always went out of his way to help any family member in need. Through this ordeal Mr. Urquidi's wife, four daughters, in-laws, nieces, extended family and friends have supported him in helping him to overcome this terrible episode in his life.

Mr. Urquidi's unfettered resolve to plea guilty to his wrongful conduct was another genuine effort toward redemption and forgiveness. Beginning with the first legal meeting, Mr. Urquidi was clear in his desire to enter a guilty plea. His decision was based on the simple fact that he had taken money that didn't belong to him. Mr. Urquidi never thought of challenging the allegation since it would have been misleading and dishonest to do so. He recognized that it was his dishonesty that resulted in his legal predicament.

Mr. Urquidi wants to prove to the Court, to his family, and the government that he can contribute to his community and that he can and will live out the remainder of his life in a lawful manner. Mr. Urquidi is asking the Court for leniency so that he may continue to work, pay back the money he wrongfully took, and to make amends through community service and home confinement. As a first time criminal offender Mr. Urquidi wants the opportunity to demonstrate a commitment to responsible and law abiding behavior. On account of the totality and circumstance of his life and pursuant to the applicable sentencing statutes and case law, Mr. Urquidi respectfully requests that the Court sentence him to a period of probation of five years.

**I.    PURSUANT TO <u>UNITED STATES v. BOOKER</u> , 18 U.S.C. § 3553(a), 18 U.S.C. § 3582,  18 U.S.C. § 3562 AND 28 U.S.C. § 991(b)(1)(B) THE COURT HAS AUTHORITY TO  SENTENCE MR. URQUIDI TO A TERM OF PROBATION**

In <u>United States v. Booker</u>, the Supreme Court held that the mandatory sentencing

4

guidelines were unconstitutional as applied. 125 S. Ct. 738 (2005)  The Court further held that judges are required to "take account of the Guidelines together with other sentencing factors," and to "consider" the guidelines along with all the other required factors (emphasis added).  The Court is not bound by the guideline range and there is no requirement that a sentence be within the guideline range.  The guideline range is just one factor to be considered along with the mandatory statutory factors delineated in 18 U.S.C. § 3553(a).

 Those factors  include, among others, the nature of the offense, the defendant's history, the need for the sentence to promote adequate deterrence and to provide the defendant with the needed educational or vocational training, and pertinent policy statements issued by the sentencing commission, and the need to avoid unwarranted sentencing disparities among similarly situated defendants. U.S. v. Clifton Price 409 F.3d 436, 442 (D.C. Cir. 2005) Moreover, Sentencing Courts have a continuing duty to "[w]eigh the purposes of sentencing listed in the Sentencing Reform Act." U.S. v. Jabber 362 F.Supp.2d 365, 369 (D. Mass. 2005).

According to the Supreme Court decisions in Gall v. United States, 128 S. Ct. 586 (2007) and Kimbrough v. United States, 128 S. Ct. 558 (2007), departing from the Guidelines in choosing a sentence is a valid exercise of discretion that cannot be judged presumptively unreasonable. The government is correct in noting that the guidelines are "the starting point and initial benchmark" in sentencing determinations. Gov. Sent. Mem at 3. (citing Gall v. United States, 128 S. Ct. 586, 596 (2007))  However, the opinion goes on to state that the "Guidelines are not the only consideration," and the court, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate," "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." Id.

The D.C. Circuit in U.S. v. Pickett, 475 F.3d 1347 (D.C. Cir. 2007) provided constructive guidance regarding the evaluation of the statutory factors in sentencing determinations.  "One, but only one, of the factors a sentencing court must also consider is the sentencing range under the Guidelines." Id. at 1352.  After a consideration of all the sentencing factors, the Court "must make an individualized assessment based on the facts presented," and "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." Gall at 597.  If the Court decides on an outside-guideline sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  Id. [1]

The primary purpose of the sentencing statute, 18 U.S.C. 3553(a), is for the sentencing court to impose a sufficient sentence, but not one that is greater than necessary.  In Kimbrough v. United States, 128 S.Ct. 558 (2007), the Supreme Court spoke directly to this issue in holding that, in light of Booker, a district court may deviate from the advisory Guidelines range for crack cocaine offenses based on a conclusion that the disparity between ranges for crack and powder cocaine results in a sentence greater than necessary to achieve the sentencing goals of § 3553(a). Id. at 564.

18 U.S.C. § 3553(a) allows the Court to take into account the particularized factors of Mr.

---

[1]In United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the Court of Appeals explained that district courts should now engage in a three-step sentencing procedure in light of Booker. First, the court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." Id. at 112. Second, the court should consider whether a departure from that Guidelines range is appropriate. Id. Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)" and determine the sentence to impose. Id. at 113.

Urquidi's life and not just the fact of his criminal conduct. This approach is consistent with the objectives of 28 U.S.C. § 991, the enabling statute of the Sentencing Commission. Both the enabling statute and the sentencing statue contemplate a flexible and particularized approach to sentencing determinations. 28 U.S.C § 991(b)(1)(B) provides Sentencing Courts with discretion to "maint[ain] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." Application of 18 U.S.C. § 3553(a) and 28 U.S.C. § 991(b)(1)(B) support the imposition of a sentence of probation for a period of five years.

## II.    THE FACTORS SET FORTH IN SECTION18 U.S.C § 3553(A) WARRANT A NONE GUIDELINES SENTENCE

As set forth below, the factors enumerated in 18 U.S.C. § 3553(a) support the imposition of a none guideline sentence for Mr. Urquidi.

### A.    The Nature and Circumstances of the Offense

18 U.S.C. § 3553(a)(1) directs the Court to look at the nature and circumstance of the offense and Mr. Urquidi's history. Mr. Urquidi's criminal conduct took place during a three-year period between 2003 and 2006. The details of his criminal conduct are summarized in the PSR see ¶ ¶ 8-9.

Mr. Urquidi's criminal conduct took place at a time when he was successfully promoting the socioeconomic objectives of the Pan American Development Fund (PADF). On account of his leadership, PADF, successfully discharged and implemented two important programs in Colombia; assistance for internally displaced Colombian citizens and macro economic

development opportunities.[2]  The criminal conduct and embezzlement covered three distinct

areas; misuse and misappropriation of the housing allowance; the misuse and misappropriation of

furnishings allowance; and failure to account for and misappropriate a personal debt.

### a.  The housing allowance

As the Director of Finance and Administration, Mr. Urquidi, was given an allowance to

cover his housing expenses in Bogota, Colombia.  Under the terms of his contract he was

prohibited from buying any property in Colombia.  During the first two years in Bogota,

Colombia, Mr. Urquidi abided by the housing restrictions and he dutifully used the money to rent

an apartment for him and his family.  In 2003, the owner of the condominium suggested to Mr.

Urquidi, that instead of renting it would make more financial sense to use the money to purchase

the condominium.  For some inexplicable reason, Mr. Urquidi, betrayed his sound judgement and

honest work ethic by agreeing to purchase the condominium.  For the next three years Mr.

Urquidi, misused his housing allowance by paying for the condominium.  When PADF

administrators raised concerns regarding his housing situation and requested a housing contract,

Mr. Urquidi compounded his mistake.  Instead of exhibiting the candor and professionalism that

had been the hallmarks of his life, Mr. Urquidi created a fraudulent rental contract which he

provided to PADF. The misappropriation of the housing allowance is by far the largest sum of

the embezzled money, totaling $131,422.

---

[2]    Undersigned counsel has attached a May 2005 performance evaluation of Mr. Urquidi that was completed by his superiors at PADF. The attachment includes an electronic message that prefaces the evaluation.  The evaluation form is written in Spanish, however the actual evaluation - what the evaluator has written is in English.  Because the evaluation narrative is written in English, undersigned counsel has not translated any portion of the document.  The attachment is included as Exhibit number 1.

### b. The furnishing allowance

As with the housing allowance, Mr. Urquidi was provided a stipend to furnish his apartment in Bogota, Colombia. Because he was moving his family, including three of his daughters, the furnishing stipend of six thousand dollars was insufficient for furnishing an apartment for four people. As with the housing allowance, Mr. Urquidi again displayed terrible judgement in making purchases in excess of 60,000. dollars. Here again Mr. Urquidi acted in a way that was completely out of character. That he did so at the age of 60 after a career that spanned thirty years is mind boggling. Ultimately, when he was terminated from PADF all the furnishings stayed with Colombia and became the property of PADF. During meetings and dinner events that took place in Mr. Urquidi's apartment, PADF colleagues saw the furniture and there was no effort on his part to hide it. None of the furniture was brought to the United States.

### c. The personal debt

During his tenure at PADF, Mr. Urquidi periodically, and almost by habit, sought advanced payments of his salary that would then be automatically deducted from his salary disbursements. This practiced, seemingly ill advised, was a common at PADF and preceded Mr. Urquidi's employment. Financial records and official requests by Mr. Urquidi show that he was following the appropriate procedures in obtaining the advances. PADF records show that Mr. Urquidi's salary disbursements were continually reduced by the agreed upon arrangement in order to satisfy his personal debt to PADF. As with the other two types of fraud, Mr. Urquidi's misappropriation and shifting of his personal debt is inexplicable in light of the agreed and open arrangement in which the reductions were openly made.

9

B.    **History and Characteristics of Mr. Urquidi**

Mr. Urquidi is, by all means, an uncommon criminal defendant. He is before the Court

with a documented history of uninterrupted professional employment and law abiding conduct.

Throughout his life Mr. Urquidi has been gainfully employed in various capacities. Probation

Officer Patricia Boyd has provided a detailed history of Mr. Urquidi' employment that began in

1968 when he was 27 years old. see PSR ¶¶ 45-55.  Moreover, he has shown an impressive

versatility and enthusiasm for work and an ability to succeed in distinct fields. Accordingly, there

is no question regarding Mr. Urquidi' work ethic and motivation for responsible and productive

behavior.

As the PSR indicates, Mr. Urquidi was born in Bolivia and has spent time in Peru, Chile,

Colombia and the United States. One of two children, Mr. Urquidi was the industrious and over-

achieving son who through hard work and perseverance would succeed in all his professional

endeavors. Two years after he arrived in the United States Mr. Urquidi enlisted in the air force in

1967. As a recent immigrant, Mr. Urquidi enlisted as a means to obtain permanent residency in

the United States. Back then, in his mid twenties his desire to stay in the United States was

motivated by his responsibility to support his parents who were living in Bolivia. After he was

honorably discharged, Mr. Urquidi went back to school and thereafter he began his long and

distinguished career both in the non-profit and private sectors.

Mr. Urquidi's family and friends have been stunned by the turn of events in his life. They

cannot comprehend how after accomplishing so much he could have acted so out of character.

The man who is to be sentenced in Federal District Court for very serious crimes is not the

person that they have known throughout the course of their lives. The court has been presented

10

with information from friends and former colleagues regarding his integrity, work ethic and commitment to improve the lives of people who historically have been socially and economically marginalized.

Although, he had the skills to work in the private sector to pursue financial enrichment, Mr. Urquidi has devoted his professional life to improving the lives of poor Latin Americans. Prior to working for PADF, Mr. Urquidi also worked for Inter-American Foundation, the World Bank, and the Inter-American Development Bank. All of these institutions have the specific mandate or pursue goals to fund programs for the social and economic development of struggling communities.

Mr. Rodolfo Ameller who has known Mr. Urquidi for more than forty years mentions how Mr. Urquidi "almost always managed to improve the quality of life of the people who worked for these projects, enlarging incomes and giving them hopes for a better future."[3] His third youngest daughter, Ana Maria Urquidi, recalls that "In all my childhood I can remember that he was always involved in activities that had to do with helping people in need and fund raising activities."[4] Mr. Urquidi's good works and his life long commitments to social and economic assistance were not lost on his youngest daughter Paola Urquidi. In her letter to the Court she relates how she "grew up in an environment where one of the most important things is to help those in need."[5] Ms. Paola Urquidi, has put into practice those words and her father's

---

[3]    Rodolfo Amellar's letter is attached as Exhibit number 2. Mr. Amellar's letter was translated from Spanish to English by Montserrat Fernandez who is an Interpreter and Administrative Assistance with the Office for the Federal Public Defender.

[4]    Ana Maria Urquidi's letter is attached as Exhibit number 3.

[5]    Paola Urquidi's letter is attached as Exhibit number 4.

example through her work as a health service coordinator that works with minority women in their struggle with breast cancer.

As he led a life of service to improve the lives of poor people,  Mr. Urquidi became a model and a source of inspiration to his own daughters and nieces.  In the words of Karla Urquidi, Mr. Urquidi's eldest daughter, she "wanted to be like him, he was my model and mentor."  As a parent, Ms. Karla Urquidi writes that he was "our guide, our mentor, teacher and our friend."[6]  Marilena Urquidi, the next oldest and mother of four, similarly writes that her father was "always a good person and an exemplary good father with me and my three sisters."[7]  Another daughter, Ana Maria Urquidi, writes "We have always wanted to be like him.  He worked all day to be able to give us the opportunity to study and have the life experiences to make us the person he was upon our eyes."

Like, their father Mr. Urquidi's daughters have put a premium on their education.  Two of his daughters are medical school graduates and the other two have advance finance degrees.  By all means they credit their father for instilling in them with values of education, hard work, selflessness and service to others.  As they grew up, they saw their father work diligently and indefatigably in promoting economic development in forgotten rural and urban areas of Latin America.  As Mrs. Urquidi states in her letter, Mr. Urquidi moved back to Bolivia to "work with social projects that were directed to help under privilege persons." The same integrity that was emblematic in his professional life was equally present in their family life.

As a spouse and parent Mr. Urquidi has demonstrated what it means to be the head of a

---

[6]      Karla Urquidi's letter is attached as Exhibit number 5.

[7]      Marilena Urquidi's letter is attached as Exhibit number 6.

household.  Throughout his life, Mr. Urquidi has been a loving and loyal spouse to Beatriz

Urquidi. In her words, Mr. Urquidi "has always been a good husband, hardworking, respectful,

with high moral values." As a father he raised his daughters "to be good persons, with moral

values, [and] to be respectful of others,"[8]

From the time that Mr. Urquidi was twenty-four years old serving his adopted country, to

returning to school, and continually aspiring professionally, Mr. Urquidi has shown a

commitment of embracing the most important values in our society; service to his country,

commitment to his family, and a consistent work ethic.  In determining an appropriate sentence

for Mr. Urquidi, the Court has a detailed history of good conduct, gainful employment and family

responsibility that support a non-guideline sentence.

### C.    The Sentence Should Reflect the Seriousness of the Offense

Mr. Urquidi recognizes that the Court must impose a sentence that reflects the seriousness

of the offense, promotes respect for the law, and provides just punishment.  While the sentence

must provide deterrence and protect the public, it must also provide Mr. Urquidi with educational

and vocational training and medical care.  In balancing all of the purposes of sentencing, the

Court must also impose a sentence that is "sufficient, but not greater than necessary, to comply

with the purposes set forth in paragraph [(a)](2)[§ 3553]." See 18 U.S.C. § 3553(a).

There is no minimizing Mr. Urquidi's criminal conduct and violation of the law.

However, a prison sentence would be a "greater than necessary sentence."  The only measurable

result of incarceration would be the satisfaction of a punitive sanction.  But punishment alone

does not promote any of the statutory goals enumerated in 18 U.S.C. § 3553(a).  A punitive

---

[8]       Beatriz Urquidi's letter is attached as Exhibit number 7.

13

sanction is not warranted given the overarching goals of sentencing.  As a first time criminal

offender Mr. Urquidi deserves what is generally available to criminal defendants - the

opportunity to demonstrate a commitment to responsible and law abiding behavior.  Mr. Urquidi

entry into the Criminal system has taken place at a point where instead of planning for, or

actually living out his retirement he is looking at spending a substantial period of incarceration.

There is no denying that Mr. Urquidi has brought about his own tribulation and that his conduct

must be punished.  However, prison is not the only form of punishment and sanction that is

available to the Court.

### D.    The sentence should afford adequate deterrence to criminal conduct

A sentence of probation will more than adequately protect the public and achieve

adequate deterrence for the following reasons.  First, Mr. Urquidi is a first time offender who

throughout his life has demonstrated sound decision making skills in all areas of his life.  If he is

placed on probation he will be subjected to a strict supervision regimen which will include

reporting to a probation officer, submitting monthly financial reports, making mandatory

restitution payments and will be required to report any change in his residence, employment and

travel outside of the metropolitan area.

In the post-Booker era courts have taken an individualized approach to sentencing when

they have a first time offender who is before the court. In United States v. Baker, 445 F.3d 987,

992 (7th Cir. 2006) the Court noted that a sentence below that recommended by the guidelines

was appropriate because prison time is more significant for a first offender and this impacts on

the statutory factors of just punishment and adequate deterrence.  See also United States v. Cull,

446 F. Supp.2d 961, 965 (E.D.Wis. 2006) (sentence below guidelines was appropriate when

defendant had never been imprisoned before because the imposed sentence "was sufficient to impress upon him the seriousness of the offense and to deter others under similar circumstances"); United States v. Qualls, 373 F. Supp.2d 873, 877 (E.D.Wis. 2005) ("generally a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.")

Similarly, age is also another factor that the Court can weigh in determining the adequacy of a sentence that will protect the community from Mr. Urquidi. Mr. Urquidi is an older man with no criminal history; as a result, he is statistically less likely to recidivate. Under the guidelines, age was not normally relevant to sentencing. However, several courts and the sentencing commission itself have noted that recidivism drops substantially with age. See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, 15 (2004), ("recidivism rates decline relatively consistently as age increases," from 35.5% for under age 21 to 9.5% over 50). A number of courts have considered this as a factor in sentencing defendants below the advisory guidelines range. See e.g., United States v. Wadena, 470 F.3d 735, 740 (8th Cir. 2006) (where 67 year old defendant convicted of mail fraud and guidelines suggested sentence of 18 to 24 months, proper for district court to impose probation because "Wadena's age and recent deterioration in his health reduce the risk of re-offending"); United States v. Lucania 379 F. Supp. 2d 288, 297 (E.D.N.Y. 2005) ("Post Booker courts have noted that recidivism is markedly lower for older defendants."); United States v. Carmona-Rodriguez, 2005 WL 840464, at *4 (S.D.N.Y. April 11, 2005) (court imposed lesser sentence because defendant was older (55) and thus there was a lower probability of recidivism).

15

A sentence that places Mr. Urquidi on community supervision and restricts him to home confinement would be more than adequate to meet the sentencing purposes set forth in 18 U.S.C. § 3553(2)(a).  Probation will subject Mr. Urquidi to a strict supervision regimen.  The obligations and requirements of probation will weigh heavy in his everyday life and should adequately protect the public.  Finally, the seriousness of the offense has to take into account and result in a sentence that "promote[s] respect for the Law and provide[s] just punishment."  A sentence of probation for the maximum term of five years can be "just punishment" when the Court considers and takes into account 18 U.S.C.§3582.   In pertinent part 18 U.S.C. § 3582 (a) states:

"The Court, in determining whether to impose a term of imprisonment, and if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation" (emphasis added)

Undersigned Counsel's request on behalf of Mr. Urquidi is admittedly extraordinary.  The request is premised on Mr. Urquidi's verified life of good works which consisted of working on behalf of impoverished communities in Latin America.  Equally important, Mr. Urquidi has been a been a loyal and loving husband, father and friend.  By imposing a probation sentence of five years, Mr. Urquidi will always be reminded of the consequences of not following through with the obligations and requirements of probation. Probation means the Court will continue to have jurisdiction and authority to incarcerate Mr. Urquidi. The threat of incarceration at the D.C. Jail or at a federal penitentiary will certainly have a preclusive effect since it's a real and tangible consequence that Mr. Urquidi does not want to re-visit.

In the context of Mr. Urquidi' character and background it is safe to assume that it is very unlikely that he will re-engage in any criminal conduct.  Mr. Urquidi has obsessively

16

ruminated and made a very sobering evaluation of his situation.  It is unquestioned that Mr.

Urquidi has led a crime free, productive and family oriented life.  That he finds himself in

Federal District Court awaiting sentencing is inconsistent with the success, aspirations and

accomplishments of his life as a student, parent, spouse, and employee.  Regrettably, his

inexplicably bad judgement that he never displayed during his young adult life and middle age

surfaced in the autumn of his life.

Mr. Urquidi has candidly admitted that he did not fully appreciate the consequences of his

deceptive behavior.  Ironically, this took place while he was simultaneously doing very good

work for which he was recognized and rewarded.  In his own words he knows that he made "a

very stupid, stupid mistake" with severe consequences that he did not foresee.  He acknowledges

that only the worst has come out of his decision to engage in serious criminal behavior.  While

his present predicament is clearly out of character he knows that he has to look forward and make

the necessary changes that the law, society and his family expect from him.

### E.  The sentence should provide the most effective rehabilitation treatment

A sentence of probation would most effectively support Mr. Urquidi's rehabilitation.  In

view of his personal history, Mr. Urquidi's need for rehabilitation is limited to his criminal

conduct in the instant case.  Throughout his life Mr. Urquidi has not displayed any pathology,

addiction or anti-social behavior suggesting the need for treatment and counseling in a Bureau of

Prison facility.  Thus, his modest rehabilitation needs can be provided and achieved in the

community with very little assistance and support from the probation office.  His obligation to

pay more than $214,800.00 dollars in restitution requires significant responsibility, planning and

the commitment to lead a modest life.  All of these factors will weigh heavy in his everyday life.

17

By no means would this structure of obligations and responsibilities be a mere slap on the wrist.

Mr. Urquidi has been shamed by his conduct. Knowing that he will be forever branded as a convicted felon has been extremely painful, humiliating and resulted in endless self deprecation. He knows that he has disappointed his wife, daughters and friends. Furthermore, he painfully acknowledges that he betrayed his employer and undermined the integrity that he faithfully developed through his long years of service.

As the Pre-Sentence Investigation Report indicates, Mr. Urquidi has pled guilty to a Class C felony. 18 U.S.C. §3561 allows for a sentence of probation for a period not to exceed five years.§ 3561(c)(1). 18 U.S.C. §3562 authorizes the Court with the discretion to impose a sentence of probation when appropriate. 18 U.S.C. §3561(a) directs the Court to impose a sentence of probation only after a consideration of "the factors set forth in section 3553(a) to the extent that they are applicable." A sentence of probation is appropriate in the instant case. Mr. Urquidi's history, the content of his person, the respect that he has shown for the law during the pendency of his case and the loyalty and responsibility that he has always demonstrated for his wife, daughters, extended family and friends support continuing his rehabilitation in the community.

## CONCLUSION

Mr. Urquidi is a decent man who made a series of terrible decisions. Those decisions have cost him dearly. Mr. Urquidi acutely understands the seriousness of his legal predicament and how his life has been impacted by his criminal case. The thought of incarceration has caused him a lot of stress and endless self-deprecation. Particularly devastating is that incarceration will separate him from his wife. Throughout their long and cherished marriage, at most he has spent

weeks away from her. Its unimaginable that he now stands to spend anywhere between sixteen months to two years away from her. Given her age, Mr. Urquidi would be leaving her in a very vulnerable point in her life. Not only does Mrs. Urquidi depend on him for emotional support, but she relies on him for maintaining the bed and breakfast business. Without Mr. Urquidi doing the physical labor, its doubtful that Mrs. Urquidi will be able to operate and maintain the business. That being the case, Mrs. Urquidi will have to rely on her own siblings and her children to support her.

Mr. Urquidi now has a felony conviction on his record which will have consequences for the remainder of his life. Mr. Urquidi, knows that he cannot undo his mistake. He does know that he will never engage in any activity that will put the remainder of his life in jeopardy. In the context of Mr. Urquidi's character and background it is safe to assume that it is very unlikely that he will re-engage in any criminal conduct.

Mr. Urquidi wants the Court to give him one opportunity so that he can demonstrate, through deeds, that he will once again lead an exemplary life that is characterized by honesty, hard work and responsibility to his community and family. So that Mr. Urquidi does not lose sight of his transgression, undersigned counsel requests that the Court sentence his to a period of Probation of five years and that he serve his first year under electronic home monitoring consistent with his work schedule. For these reasons undersigned requests that the Court sentence Ms. Carlos M. Urquidi to a period of probation of five years.

Respectfully submitted,
A.J. Kramer
Federal Public Defender

_____/s/_____
Carlos J. Vanegas
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

# EXHIBIT
# 1



## Carlos Urquidi

**De:**      John Heard

**Enviado:** Lunes, 16 de Mayo de 2005 09:39 a.m.

**Para:**    Carlos Urquidi

**Asunto:**  FW: Carlos - evaluation

**From:** John Heard
**Sent:** Monday, May 16, 2005 9:36 AM
**To:** 'John Sanbrailo'; Jack Bluestein; 'Amy Coughenour'; Holly Flood
**Subject:** FW: Carlos - evaluation

Attached is a mid-term evaluation I did on Carlos Urquidi.  He has done a truly amazing job here over the past six months and deserves great credit for keeping the ship afloat during an extremely difficult time and for doing a spectacular job on the cost portions of our various proposals – four in all.

John

## SEGUIMIENTO AL DESEMPEÑO

| Funcionario:<br>Carlos Urquidi | Área/Programa:<br>Finance and Administration | Periodo Seguimiento:<br>Desde: Octubre de 2004<br>Hasta: Marzo de 2005 |
|---|---|---|
| Cargo: Director, Finance and Administration | Responsable:<br>John Heard | Fecha Seguimiento:<br>Abril 2005 |

### I. OBJETIVOS ALCANZADOS

**a.) Calidad del Trabajo – Resultados (Conocimiento, calidad, precisión, productividad, oportunidad)**

For Carlos this has been an extraordinary period of high production under enormous pressure. During the last month of the period he had to function as the Acting Director while simultaneously developing the financial plans and budgets for <u>four</u> competitive proposals. His productivity under pressure was nothing short of amazing, while also juggling the ongoing demands of our two major programs in execution. Carlos demonstrates great creativity in his management of financial operations and an extraordinary ability to negotiate effectively under pressure. whether it be with our partner organizations, IOM and ARD, or with the owners of the new building where we will move later this year, or with implementing organizations such as the Fundación Mario Santo Domingo. The quality and precision of his work is beyond question as is his ability to deliver high quality results in record time. During this period he also managed the preparation and conduct of two RIG audits and a third by RAFFA. The effort and creativity he put into these challenges was extraordinary and will pay major dividends down the road.

**b.) Aportes en su trabajo (Iniciativa, creatividad, sentido común, etc.)**

Carlos is the most creative financial director the writer has known in thirty plus years of experience. Although focused on finance, he consistently comes up with innovative solutions to operational problems whether or not they relate to finance. His initiative, dedication and common sense have been of inestimable value in dealing with the more thorny challenges we have in our portfolio, including the Cordoba agricultural project, Riohacha and the Sincelejo center. He deserves tremendous credit for managing the Foundation's program in a highly professional and effective manner during the two months following the departure of the former director. While the former director was in place, Carlos demonstrated great presence of mind and high levels of skill in managing ongoing operations while being ignored relative to important meetings and decision making. He was key to maintaining order and keeping the program moving effectively despite the absence of leadership and program management in place in the front office during the first two months of this year. Carlos' creativity in management of multiple pots of money and protecting the Foundation through establishment of numerous reserve mechanisms has been of enormous value, and will be even more important in the future as we approach closeout of the IDP project. Carlos showed creativity and good judgment in the hiring of Hector Cortes as Director of Administration and Security. Hector has already made tremendous improvements in management of both areas.

**c.) Trabajo en Equipo**

Carlos is a team player all the way – working closely with the program side of the house on all important actions and activities. He maintains a close professional relationship with the other office directors and the writer and is totally collegial in his dealings with internal and external actors of all types and levels. The recent period has exposed Carlos more to USAID and he has consistently impressed officials, especially the Deputy Mission Director, with his detailed program knowledge and creative responses to challenges we face. During proposal preparation and in general Carlos has worked as a highly effective team member with all sides of the house – including the IDP and AD programs and the new Director of Administration.

**d.) Relaciones Interpersonales**

Carlos has great interpersonal skills and exhibited these throughout the period under the most difficult circumstances, in the process showing a caring attitude and great respect for the extraordinary effort made by others during the recent period of high performance under pressure.

**e.) Comunicación efectiva (Lenguaje hablado y escrito)**

Carlos is an effective communicator especially in the area of financial management. His performance with the auditors from the RIG and RAFFA was especially noteworthy as was his careful and demanding management of

(16)

| preparations for these important visits. |
|---|

II. EVALUACIÓN GENERAL

a.) Comentarios del evaluador

Without question Carlos' performance during the period has been outstanding. If we win one or more of the competitions in which we are now engaged, we will owe him a major debt of gratitude for his creative budgeting and financial planning skill as well as a constant stream of good ideas related to plans and structuring of operations under these proposals.

Carlos is a tremendous asset to this organization and we should make every effort in the future to assure that he has new opportunities for growth and the ability to contribute to the overall expansion of the Foundation's program both in Colombia and elsewhere in Latin America.

b.) Comentarios del Funcionario

I sincerely appreciate your comments. Count with me.

_FIRMA DEL FUNCIONARIO_                    _FIRMA DEL EVALUADOR_

# EXHIBIT
# 2

(English translation from Spanish)

May 23, 2008

The Honorable Judge
Henry H. Kennedy
United States District Court
333 Constitution Ave. N.W.
Washington DC. 20001

Honorable Judge Kennedy:

My friend Carlos Urquidi contacted me and let me know the serious
problem he is in. I want to help him and this is why I am writing to
you honorable Judge Kennedy.

My name is Rodolfo Ameller and I live in the city of La Paz, Bolivia. I
am 74 years of age, married with four children and five grand children.

I know Carlos for more than 40 years.  We have worked together in
BIBSA and we developed various social projects to help poor needy
agriculture families. First of all, I want to inform you that I believe
Carlos is a beautiful person, with a lot of positive qualities that very
seldom you find in the majority of  people. He has always been a
correct person, honest, entirely dedicated to his family, with kind
attitudes and love for his friends and other people  he was always
incline to help everybody. He is a person that when somebody has a
problem, he is the first one you approach and he always  has  the
desire to help you . In his work he has always been a good
professional, where he has given all his effort and knowledge to get
good results that benefit  many people.

In my particular case,   Many years ago I almost was bankrupt  and I
seeked the help of Carlos . I visited in his office, I told him all my
problems and without any more details he offered me to work with
him. He assigned me to a  project in the city of Yacuiba, where he put
me in charge of an agriculture project that produced soy beans to feed
cattle for a very important group of poor farmers. Very often I had the
visit of Carlos, and he would meet with all the beneficiaries and
evaluate the results of the project. Most of the time he was able to
improve the quality of life of those people that worked in the project,
increasing their income and given them hopes for the future. All the
people that worked in the project were very thankful to Carlos and
they liked him very much, since they realized that  he was  a very

generous person, with human quality and always willing to help them. This is why with the help of Carlos I could go on and continue my life, and now that I retired I have the necessary income to live a decent life. Other people had also the same experience with Carlos, he was always willing to help people.

Now I know  Carlos committed a grave mistake and how sorry he is  . I believe   that any mistake committed in his life was without any intension of wrong doing and certainly not harm anyone, he made a mistake, yes, but now he wants to solve it in the best way possible, this is why Honorable Judge Kennedy that I am writing you and beg you to help my friend Carlos and give him the opportunity that he needs.

Thanking you in advance and begging one more time for your benevolence and understanding. Sincerely,


Rodolfo Ameller
Barrio Los Pinos
Calle 25
San Miguel
La Paz – Bolivia
Teléfono 011-591-22770010

# EXHIBIT
# 3

La Paz – Bolivia

June 15, 2008

The Honorable Judge
Henry H. Kennedy
United States District Court
333 Constitution Ave. N.W.
Washington DC. 20001

Dear Judge Kennedy,

I write to you in this moment of sadness because I learned from my father that one has to
fight for what one wants until the end. I am writing this letter not to try to convince you
to not put my father in jail, but to tell you a little of who my dad is. I am Ana Maria, 29
years old, and I am a medical doctor.

I grew up in Bolivia and lived with my parents until I left for college. In all that time I
grew up admiring my father for the type of person he was. I remember going to a club in
La Paz and he was always surrounded by friends, every time we went there everybody
came up to him to salute him. He was a man full of positive energy that transmitted
nothing but happiness to other people. In all my childhood I can remember that he was
always involved in activities that had to do with helping people in need and fund raising
activities.

My father has always been a family oriented person. I have three sisters and we all are
very close to each other; and the reason for this is because of all the values that my dad
has taught us. He was an example for us. My three sisters and including me, thanks to
his hard work, were able to go through college and get a degree. We have always wanted
to be like him. He worked all day to be able to give us the opportunity to study and have
the life experiences to make us the person he was upon our eyes.

One of the most important values that he taught us was HONESTY. He showed us day
by day how one can succeed in life just by being honest. He has always been a very hard
working man with many aspirations in life, but all this based on honesty. I am aware of
the mistake he has committed; it is a big error, of which he is much repented. Having
done so many good things in life and then having to think that you committed a stupid
mistake is very exasperating. He admits he has committed a mistake, and that again
shows the type of person my dad is.

In this moment, he is working harder than ever to be able to help my younger sister, my
mother and I financially. He is not young anymore, it is very hard at this age to be able to
get a job, to be able to succeed again, and he is an example to me because he fought to get

a job, he works very hard to be able to give us anything, and to be able to pay his debt, and to survive.

Without my dad, we would not be the people we are, I owe him my life, and this is why I beg with all my being, not to put my dad in jail. Let him continue to work to be able to help us financially, help himself pay his debts and help my mother as well. We have nothing else but his job in a Bed and Breakfast. He is a good man that will serve for what he has done, but please I beg you to be benevolent with my father, he is a very good man and will work until the day he is gone.

I thank you for taking in consideration my letter, being this a very difficult situation.

Sincerely,

Ana Maria Urquidi
La Paz, Bolivia
Telef. 011-591- 70140004

# EXHIBIT
# 4

June 16, 2008

The Honorable Judge
Henry H. Kennedy
United States District Court
333 Constitution Ave. N.W.
Washington DC. 20001

Dear Judge Kennedy:

My father gave me the greatest gift anyone could give another person, he
believed in me, and thanks to that I can say I am where I am because of him. I
am Paola Urquidi the youngest daughter of my father Carlos Urquidi. I am 25
years old, single and live in Miami, Fl. I went to school in Guadalajara, Mexico
where I studied Medicine. I just graduated last January as a general doctor and
now I am studying to take my medical board exams in order to practice medicine
in the US and also do my internship and specialty here.

Besides studying I am also working for a Non-profit agency YWCA of Greater
Miami- Dade as a health services coordinator for minority women in the fight
against Breast Cancer. I grew up in an environment where one of the most
important things is to help those in need. My father has told me everything that
has happened when working in Colombia which is what brought him to this
situation now. I am very sorry to hear what happened and afraid of what the
consequences might be. I am writing to you to ask to please be compassionate
when taking your final decision on his sentences.

I once read on a hallmark father's day card: "A man's worth is measured by how
he parents his children. What he gives them, what he keeps away from them, the
lessons he teaches and the lessons he allows them to learn on their own".

Thankfully, there is no measurement great enough to measure the worth of my
father. He is a man who has always done what is correct and has always taken
the right path and made accurate decisions and has made sure that we do the
same. He has always tried to keep us away from harms way, and if we made a
mistake he has always supported us while we got back on our feet and made
sure we learned from the experience and try again.

Being the youngest I have had the opportunity to live with my dad in Bogota,
Colombia where I had a chance to accompany him to his development projects
which he was really proud of because of the good he was doing and the help he
was giving the less fortunate people of Colombia. Everybody loved him there,
including his coworkers.

He has always taught me the value of things, the right thing to do, he has always
cared for me in the most utter way possible. When I look back to the semester I

lived with my father alone in Washington D.C my senior year of high school all I remember is how great he was with me. He would cook breakfast for me everyday as well as make my lunch box before driving me to school each morning before going to work. After work even if he was exhausted he would sit down with me and go over my homework to make sure I had done it correctly or if I had any questions he could help me with, then we would go to the kitchen where we would talk about our day while I watched him cook dinner for us two. All I hope for is that when I have my own children they have a loving father such as mine.

I understand the gravity of the situation and know that my father is truly sorry. He is now a senior citizen and has lesser years ahead of him. He is in much anguish and distress as well as I think my whole family is and I really believe that time in jail will end up destroying him. He is devastated because of the huge responsibility that he has with his whole family, please let him make up for what he did, with my mother and us.

As I write to you with tears in my eyes and a huge sense of impotence and anguish I beg of your mercy. I ask you to please be compassionate when taking your final decision on his sentences. We all need him as much as he needs us to get through this.

Thank you for you time and compassion,


Sincerely,
Paola Urquidi
31 SE 5th Street Apt 2108
Miami, Fl 33131
(786)704-6705

EXHIBIT
5

June 15, 2008

The Honorable Judge
Henry H. Kennedy
United States District Court
333 Constitution Ave. N.W.
Washington DC. 20001

Dear Judge Kennedy:

My name is Karla Urquidi and I am the oldest daughter of my father Carlos
Urquidi. I would like to share some information about myself and my father.

I am 35 years old, married with two children and one on its way. I am currently
living in Caracas, Venezuela since January of last year. I have a degree in
Business Administration from American University in Washington D.C., a MBA
from The Catholic University of Bolivia, a degree that is awarded by the Harvard
School of International Business and also a MFA in Computer Art Design from
the University of Madrid, Spain. In Bolivia I have worked with Ernst & Young and
in the Bolivian State Petroleum Company, YPFB.

Everything I was able to accomplish was not only because of my personal work
and effort but mostly because of the example, teaching experience and support
that I received from my father. He taught me the moral principles that one person
must have in life, that you always have to proceed and act in a correct way, that
you must be an honest and hard working person. He made absolutely all his
effort, financially, morally and psychologically to give me, and my sisters, the best
of everything; he even sacrificed his and my mother's personal needs for us.

My father has always guided us in the correct way. He even made an enormous
financial effort to send us to the American International School in La Paz, Bolivia,
because he thought that the American education and way of life was the best;
and it would give us chances and opportunities in the United States as it did for
him. He came to the United States when he was very young, working very hard
to succeed and that is what he wanted to give us: a good education, and
opportunity that could lead us to have fulfilling lives.

We are a very close knit family, and depend very much on my father, he is our
guide, our mentor, teacher and our friend. We are constantly in contact with him,
he talks with his grandchildren every day and they adore him.

My father also taught us his love, dedication and motivation for sports. During my
elementary and high school years he would take us to play golf at 6:00 am every
weekend. He taught us to be dedicated and hardworking in anything we would
do. My sister and I were part of the Bolivian National Team that participated in

various international tournaments and he was our mentor giving us his example and support.

I have always looked-up to my dad. I wanted to be like him, he was my role model and mentor. He always taught us to do things right with dedication and with all our effort and try our best and also to respect and be honest and fair to other people. He is a healthy (he always taught to get up early, eat healthy, exercise, he didn't have unhealthy habits), sincere, honest, dedicated, hard working and caring person, he is the perfect father, and he has dedicated his life to us. Everything I have accomplished in my life is because of my father and family .He has always been there for me. He is the kindest person I know, and has always put us as his priority in life.

Please Judge Kennedy, I beg you to take into consideration that my father regrets his actions and that if he could go back and do things right he would do so immediately.  He is suffering very much already for what he has done. My mother and Father both work in a Bed and Breakfast and they need to continue doing so or my mother will have no income to support herself.

I enclose pictures of my family and beg you once again to give this case a special consideration.

Sincerely,


Karla Urquidi
Res Karina 4C, Valle Arriba
Caracas, Venezuela
Telephone 011-58-4168231371

# EXHIBIT
# 6

June 16, 2008

The Honorable Judge
Henry H. Kennedy
United States District Court
333 Constitution Ave. N.W.
Washington DC. 20001

Dear  Honorable Judge Kennedy:

I am the wife of Carlos Urquidi and with enormous sorrow and despair I write to you
because of my husbands situation.

I met my husband in Washington DC in 1967. I was attending the University of
Maryland in the evenings and working during the day for Braniff Airlines. At that time I
was living with my parents. My father was working for the Inter-American Development
Bank. My husband at that time lived with his mother. He was also working for the Inter-
American Development Bank and going to school at night.

We married in September of 1969 at the Blessed Sacrament Church in Chevy Chase,
Maryland. We lived our first eight years in Maryland. During this time we obtained our
degrees from the universities and worked very hard. My two older daughters were born
in Washington DC.

My husband has always been a good husband, hard working, respectful, with high moral
values. He is a caring and devoted father. During our 39 years of marriage we have had
an excellent relation, always respectful of each other and with much love.

In 1977 we decided to go back to Bolivia where my parents lived. The years we spent
there were very rewarding. Carlos worked for different institutions that were involved in
social projects that were directed to help under privilege persons. My two younger
daughters were borne in Bolivia.

My husband raised our children to be good persons, with moral values, to be respectful of
others, the importance of education and also he gave them the love of sports.

We sent our two older daughters to study in Washington DC because we wanted them to
have the best education possible. For this, we both work very hard, so that our children
would become responsible and good professionals. Our two younger daughters studied
medicine in Guadalajara, Mexico and today they are studying to take the board exams to
be able to work as doctors in USA. This is a long process that takes at least three years,
and they still need our support.

Carlos in Bogota, Colombia, was recognized in PADF as a hard working and dedicated
person and all his co-workers liked him very much. Our lives have turned upside down
since Carlos lost his job. It has been extreme difficult for me and all my family. Carlos

has suffered more than anyone can imagine, specially when he was arrested and charged with a legal suit. It was very hard telling his daughters that he was responsible for the actions that he was involved. He is truly sorry for the mistake that he has committed. He wants to make amends and once again be the respectable person he was. We are now working as innkeepers in a small Bed and Breakfast where we do all the cleaning, cooking and maintenance of the place. We do not receive a salary but we were given a small room to live in and we only earn commissions on sales.

I have given you all this information so you will know what kind of person my husband is. He made a terrible mistake and he is suffering the consequences of his actions. He is truly sorry for what he did and he would never, never do it again. I beg you to give him the chance to amend his mistake and not send him to jail, because going to jail would serve no purpose in his case. He has already suffered tremendously these past two years and at his age, 67 years old, the impact of going to jail would be very hard on him and all his family.

I ask you to please consider this plea of mine to keep my family together and give us the opportunity to continue working and repay our debts.

Thank you for your kind attention and consideration.


Sincerely,


Beatriz Urquidi